UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HEATHER ALDRIDGE, | ) | |
| | ) | |
| **Plaintiff,** | ) | Case No. 11 C 3041 |
| | ) | |
| v. | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| LAKE COUNTY SHERIFF'S OFFICE, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant, Lake County Sheriff's Office, argues that plaintiff, Heather Aldridge, was a deputy for 16 years, received satisfactory job performance during that time, was appointed to the special duty K9 unit twice, and it approved these advancements knowing plaintiff was a woman. Defendant, therefore, argues that plaintiff cannot make a case that she was subjected to unlawful discrimination on the basis of her gender. Rather, defendant claims that plaintiff's own actions, when she failed to follow certain procedures, resulted in her removal from the special duty unit.

We find plaintiff has offered enough evidence of suspiciously timed acts, directed at her, in close proximity to the adverse employment action, to present a genuine issue of fact as to defendant's reason for her demotion. We also address defendant's argument that any hostile work environment claim should be barred. For the reasons we outline herein, we agree. Defendant's motion for summary judgment is, therefore, granted in part and denied in part [dkt. 114].

**I.     Background**[1]

Plaintiff started with defendant's office in May 1997.[2] (By 2011, plaintiff was one of thirteen female deputies out of 195 total deputies and command officers employed by defendant). In 1999, she, along with Deputy Jill Garross ("Garross"), were the first female deputies appointed to the Sheriff's K9 Special Duty Unit.[3] With this position came higher status and the opportunity for overtime pay.[4] In January 2009, defendant announced the retirement of the two K9s assigned to plaintiff and Garross. Rather than assigning new K9s to these two officers, as defendant had done for all male K9 officers in the past, defendant required plaintiff and Garross to interview with the other interested deputies to stay with the K9 Special Duty Unit.[5]

At that time, plaintiff complained to Sergeant Troy Oldham, Sheriff Mark Curran, and Undersheriff Eckenstahler that she and Garross did not automatically get reassigned new k9s. Sheriff Curran said he wanted "new blood."[6] Undersheriff Eckenstahler acknowledged that Sheriff Curran "wanted to give the boys a chance," but told plaintiff that she would be assigned a dog.[7] After the interview process, plaintiff was reassigned to K9 Special Duty but Garross was not, and was replaced by male Deputy, Robert Bell.

Prior to receiving her second K9, Zulu, plaintiff had not received any performance-related oral or written warnings, with the exception of missing a presentation in 2008.[8] But beginning on

---

[1] The facts are taken from the parties' Local Rule 56.1 Statements as follows: Plaintiff's Response to Defendant's Local Rule 56.1 Statement ("Pl's Resp. to Def's L.R. 56.1"); Defendant's Response to Plaintiff's Affirmative Local Rule 56.1 Statement ("Def's Resp. To Pl's L.R. 56.1"); and Defendant's Response to Plaintiff's Local Rule 56.1 Statement of Additional Material Facts ("Def's Resp. to Pl's L.R. 56.1 Add'l Facts").
[2] Pl's Resp. to Def's L.R. 56.1, ¶9, dkt. 122.
[3] Def's Resp. to Pl's L.R. 56.1, ¶15, dkt. 139.
[4] Def's Resp. to Pl's L.R. 56.1, ¶5, dkt. 139(noting that plaintiff became the highest paid female sworn officer in defendant's employ).
[5] Def's Resp. to Pl's L.R. 56.1 Add'l Facts, ¶¶17-18, dkt. 138.
[6] Pl's Resp. to Def's L.R. 56.1, ¶29, dkt. 122.
[7] Def's Resp. to Pl's L.R. 56.1, ¶19, dkt. 139.
[8] Def's Resp. to Pl's L.R. 56.1 Add'l Facts, ¶3, dkt. 138.

March 9, 2009, plaintiff received a variety of write-ups, verbal reprimands, and warnings.[9] Her first written discipline in 15 years of service with defendant was on July 9, 2010, by Sheriff Curran. Sheriff Curran stripped plaintiff of her dog and her K9 Special Duty assignment, and ordered a three day suspension without pay. That discipline was a result of the following incident, which is the linchpin to plaintiff's ultimate demotion.

On January 10, 2010, plaintiff was called to a school regarding a potentially dead dog, which upon investigation plaintiff determined was a plastic coyote in the lawn of the school.[10] Plaintiff took the plastic coyote, put it in the back of her car, and later threw it in a dumpster in her garage, thinking it had been a prank.[11] On April 29, 2010, plaintiff was again called to the same school regarding a coyote on the school property.[12] Plaintiff spoke with the superintendent who explained that it was a plastic decoy coyote and that one had been stolen earlier in the year. Plaintiff then explained that she had the coyote and offered to return it to the school.[13] Then in May 2010, Sergeant Oldham asked plaintiff about the missing plastic coyote.[14] Her union representative told her to place the coyote into evidence immediately, which plaintiff promptly did the next day. (This was six months after it was originally picked up from the school).[15]

Two months later, on July 9, 2010, plaintiff was stripped of her second K9.[16] This was apparently based on her failure to place the plastic coyote into evidence after she retrieved it, and because of a complaint submitted by the superintendent of the school several months after the coyote

---

[9]Def's Resp. to Pl's L.R. 56.1, ¶¶60-68, dkt. 139.
[10]Pl's Resp. to Def's L.R. 56.1,¶60, dkt. 122.
[11]Pl's Resp. to Def's L.R. 56.1,¶61, dkt. 122.
[12]Pl's Resp. to Def's L.R. 56.1,¶62, dkt. 122.
[13]Pl's Resp. to Def's L.R. 56.1,¶62-63, dkt. 122.
[14]Pl's Resp. to Def's L.R. 56.1,¶64, dkt. 122.
[15]Pl's Resp. to Def's L.R. 56.1,¶64, dkt. 122.
[16]Def's Resp. to Pl's L.R. 56.1 Add'l Facts, ¶21, dkt. 138.

incident. In the complaint, the superintendent requested the coyote plaintiff took be returned to the school, and noted that plaintiff was unprofessional, and appeared "angry and annoyed" when addressing her.[17] Plaintiff was then replaced by a male K9 handler, who was let go 18 months later because he was unable to handle the dog.[18]

## II.	Legal Standard

When deciding a motion for summary judgment, the Court does not judge the credibility of witnesses, evaluate the weight of the evidence, or determine the ultimate truth.[19] The Court is instead to ascertain whether there exists a genuine issue of fact.[20] The party seeking summary judgment must identify the portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes shows an absence of a genuine issue of material fact.[21] To determine whether a genuine issue of fact exists, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party.[22] The party moving for summary judgment can prevail by showing "that the other party has no evidence on an issue on which that party has the burden of proof."[23] The moving party is not required to disprove the opponent's case but, rather, must establish a lack of evidentiary support for the non-moving party's position.[24] If that burden is met, the nonmoving party must then put forth facts showing a genuine issue for trial.[25]

---

[17] Def's L.R. 56.1, ¶67, exh. 12, dkt.116.
[18] Def's Resp. to Pl's L.R. 56.1, ¶21, dkt. 139.
[19] *Anderson v. Liberty Lobby,* 477 U.S. 242, 249-50 (1986).
[20] *Anderson,* 477 U.S. at 249-50.
[21] *See* Fed.R.Civ.P. 56(c)*; see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).
[22] *Anderson,* 477 U.S. at 255; *Omnicare Inc. v. UnitedHealth Grp., Inc.,* 629 F.3d 697, 704 (7th Cir. 2011).
[23] *Brazinski v. Amoco Petroleum Additives Co.,* 6 F.3d 1176, 1183 (7th Cir.1993).
[24] *Celotex Corp.*, 477 U.S. at 325.
[25] Fed.R.Civ.P. 56(c); *Celotex Corp.*, 477 U.S. at 324.

**III.    Analysis**

First, defendant argues that plaintiff's hostile work environment allegations fail because they fall outside the scope of her EEOC charge, and because she would not be able to prove the necessary elements of such a claim. Defendant then argues that plaintiff cannot prove her Title VII gender discrimination count under either the direct or indirect method of proof.

    **A.    Title VII Hostile Work Environment**

1.

First, defendant argues that plaintiff's hostile work environment claim is barred, citing the general rule that a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge.[26] We must point out that plaintiff has not filed a hostile work environment claim, only allegations that would relate to such a claim. We will address this portion of defendant's motion as a motion to strike those allegations.

Plaintiff has an undated, unsigned EEOC charge, which does not specifically complain of, or allege, a hostile work environment. Because she only checked boxes for "sex" and "age" discrimination and claimed she was "disciplined, demoted, and subsequently reassigned" when other male deputies were treated more favorably, defendant argues her charge says nothing that would put it on notice that she was alleging a hostile work environment. As noted, claims must either be included in the EEOC charge, or must be "'like or reasonably related to the allegations of the charge'" and grow out of those allegations to be considered by the court.[27] To be alike or related

---

[26]*Cheek v. Western and Southern Life Ins. Co.,* 31 F.3d 497, 500 (7th Cir. 1994).
[27]*Haugerud v. Amery School District,* 259 F.3d 678, 689 (7th Cir. 2001)(quoting *McKenzie v. Ill. Dep't of Transp.,* 92 F.3d 473, 481 (7th Cir. 1996).

there must be a factual relationship between them, meaning the charge and the complaint should "describe the same conduct and implicate the *same individuals*."[28] But this Circuit has also recognized that employees often file their EEOC charge without legal assistance, therefore, "a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint."[29]

This case is no different. Here, plaintiff filed her EEOC charge *pro se*. The fact that plaintiff did not check the boxes for "Other" or for "Continuing Violation," as defendant argues she should have done, says nothing about whether defendant would have been on notice that she would allege a hostile work environment claim. And because the issue in these disputes often narrows to whether the defendant had "reason to be surprised" by the claims alleged, we look now to how the EEOC charge and the complaint compare.[30]

The EEOC complaint alleges that plaintiff was "disciplined, demoted, and subsequently reassigned, whereas, younger male Deputies that committed harsher offenses were treated with less discipline." In contrast, plaintiff's complaint alleges that:

> Defendant acted willfully and in bad faith in discriminating against plaintiff on the basis of her sex, by creating a hostile environment consisting of a pattern of offensive conduct directed at plaintiff and other female officer employees of defendant, which pattern of behavior had the purpose and/or effect of unreasonably interfering with work performance of plaintiff and altering the terms and conditions of her employment, including but not limited to:
>     a. Verbal and physical sexual advances and pervasive derogatory name calling of females by male employees;
>     b. Pervasive and systematic complaints about plaintiff's performance

---

[28] *Cheek,* 31 F.3d at 501.
[29] *Id.* at 500.
[30] *See Haugerud,* 259 F.3d at 690.

based on fictitious and minor infractions.[31]

Here, the specific allegation of a hostile work environment was included in the federal complaint, but not the EEOC charge. We balance this with the reality that plaintiff was *pro se* and did not have the option to check a box for such a claim.

Still, defendant would like us to follow the principle that "allegations of a different type of discrimination," than those alleged in an EEOC charge, "in a subsequent complaint are not reasonably related to them unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge."[32] Defendant then distinguishes this case from *Haugerud v. Amery School District,* where the court found new allegations in the federal complaint to be sufficiently related to the plaintiff's explanation of her claims in her charge of discrimination because the charge itself "was based on 'sex discrimination and harassment.'"[33] We acknowledge that this case does not have the added detail that the plaintiff in *Haugerud* included in her charge; there she explained her stress from increased workload and noted that negative remarks were made about women.[34] Here, plaintiff merely stated that she was "disciplined" and "demoted" when other males were not.

Under Title VII, "an employee faces a hostile work environment when, 'the conduct at issue unreasonably interferes with an individual's work performance or creates an intimidating, hostile, or offensive working environment.'"[35] Though the very bare allegation in the EEOC charge itself does not reveal that plaintiff was complaining of an "intimidating" or "offensive working

---

[31]Pl's Complaint, ¶90, dkt. 1.
[32]*See Cheek,* 31 F.3d at 503.
[33]*See Haugerud,* 259 F.3d at 689-90 (finding that because the Equal Rights Division complaint specifically stated that it was based on sex discrimination and harassment, despite the EEOC charge only referring to the elimination of jobs by women, the defendant "had no reason to be surprised by the nature of her legal claims...").
[34]*See id* at 690.
[35]*West v. Ortho-McNeil Pharmaceutical Corp.,* 2003 WL 260710, *6 (N.D. Ill. 2003).

environment," these allegations - ultimately referenced in plaintiff's complaint - reasonably would have been expected to grow out of her more general charge of discrimination.[36] Courts have found that factual statements in an EEOC charge "may implicate several different types of illegal discrimination."[37]

The ultimate gage is whether the allegations in the complaint describe the same conduct and implicate the same individuals as those found in the EEOC charge.[38] Here, plaintiff's EEOC charge does not implicate any individual or detail any particular conduct on the part of defendant. But we find that though the focus of her charge was general, "one could expect that the EEOC investigation would have grown to look at" her work performance in her particular office environment, implicating the same principle players for both her claims.

2.

But whether plaintiff's hostile work environment allegations based on gender discrimination rise to the level of a statutory violation requires plaintiff to prove that "her work environment was both subjectively and objectively offensive; 'one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'"[39] The additional elements to such a claim require a showing that: plaintiff was a member of a protected class; the conduct was pervasive or severe; and there is a basis for employer liability.[40] The Seventh Circuit has been clear to point out that the threshold for a plaintiff is high because, to be actionable, a hostile work environment

---

[36]*Hemmige v. Chicago Public Schools,* 786 F.2d 280, 283 (7th Cir. 1986).
[37]*See Babrocky v. Jewel Food Co.,* 773 F.2d 857, 866 (7th Cir. 1985).
[38]*Geist v. Glenkirk,* No. 01C0700, 2001 WL 1268574 *5 (N.D. Ill. Oct. 23, 2001)(referring to the lesson from *Cheek v. W&S Life Ins. Co.,* 31 F.3d 497 (1994)).
[39]*Cerros v. Steel Technologies, Inc.,* 288 F.3d 1040, 1044 (7th Cir. 2002)(citing *Gentry v. Exp. Packaging Co.,* 238 F.3d 842, 850 (7th Cir. 2001).
[40]*Id.*

claim must show a "hellish" workplace.[41]

Defendant argues that none of the verbal reprimands, warnings, or the ill-equipped squad car that plaintiff was issued, gives rise to the "hellish" environment needed to prove a hostile workplace claim. On this point, we agree. Plaintiff focuses on the time period just after receiving her second K9, when she argues that she began being particularly scrutinized. Plaintiff compares her disciplines and warnings to *Cerros v. Steel Technologies, Inc.,* where the working environment was made hostile by "direct and highly offensive racial epithets by employees and supervisors."[42] But in that case the plaintiff was subjected to what the court deemed an "appalling litany of misconduct" and found that after adding up "all of the derogatory names directed at Cerros as well as all of the graffiti on the bathroom walls, and coupling that with more information about how frequently or how long the abuse endured," there was a question of fact as to the pervasiveness and the severity.[43]

Here, however, plaintiff argues that her workplace environment changed "from fifteen years of positive reviews to regular and frequent criticism of her performance because she was a female" in a special duty unit.[44] In support, her allegations add up to threats of disciplinary action, in the form of reprimands, and her claim that the squad car she was issued was in poor condition. Though many of those reprimands were unfounded, as defendant argues, plaintiff does not reference how that conduct affected her work performance or her psychological well being. Without more, we cannot conclude that the totality of the circumstances constituted harassment "sufficiently 'severe or pervasive to alter the conditions" of plaintiff's employment.[45] Specifically, to establish the element

---

[41]*See Whittaker v. Northern Ill. Univ.,* 424 F.3d 640, 645 (7th Cir. 2005)(quoting *Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1013 (7th Cir. 1997)).
[42]*See Cerros v. Steel Tech., Inc.,* 288 F.3d 1040, 1046 (7th Cir. 2002).
[43]*Id.*
[44]Pl's Resp. at 42, dkt. 121.
[45]*See Brown v. Shinseki,* 892 F.Supp.2d 1019, 1027 (N.D. Ill. 2012).

requiring severe or pervasive conduct, the harassment had to be so offensive that the environment seriously affected the individual's psychological well-being, which, as noted, we do not have evidence of here.[46] We also use as a guide the various cases where hostile work environment claims were sustained. Those examples include severe conduct such as physical assaults, inappropriate comments requesting sex, racial epithets directed at the plaintiff, or repeated harassment involving the plaintiff's race or religion.[47] We recognize that it is difficult to "precisely define what constitutes a hostile work environment,"[48] but we are not convinced that there was a sufficient level of severity or pervasiveness to trigger liability under Title VII.

### B. Gender Discrimination

We now move to plaintiff's count for discrimination based on her sex. She argues that due to defendant's discrimination, she lost her special duty assignment, between $38,000 and $50,000 in compensation per year, and was held to different expectations than males. There are two ways a plaintiff can prove discrimination under Title VII: under either the direct or the indirect method of proof.[49] Plaintiff proceeds under both methods of proof.

Under the direct method, the plaintiff may show, either through direct or circumstantial evidence, that the employer's decision to take the adverse job action against her was motivated by an impermissible purpose, such as sex.[50] "Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on

---

[46] *Id.*

[47] *See id.* at 1028(referring to a variety of cases where a hostile work environment claim was sustained).

[48] *See Haugerud,* 259 F.3d at 696 (finding the treatment a "close call" but ultimately concluding that a reasonable fact finder could determine the plaintiff was treated differently than her male colleagues because of her sex in a manner that was harassing).

[49] *Scaife v. Cook Cnty,* 446 F.3d 735, 739 (7 Cir. 2006)(citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 688 (1973)).

[50] *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 548 (7th Cir. 2011).

inference or presumption."[51] But a plaintiff may also establish her direct case by presenting a convincing mosaic of circumstantial evidence that a reasonable juror could use to infer intentional discrimination by the decisionmaker.[52] Circumstantial evidence can come in two forms, either (1) statements or behavior towards employees in the protected group that, taken together, "allow an inference of discriminatory intent," or (2) evidence that employees outside the protected class were systematically treated better.[53]

First, under the direct method of proof, plaintiff presents statistical evidence, admissions, and ambiguous statements, along with a "mosaic of suspiciously timed circumstantial evidence" that defendant subjected her to acts that resulted in her being stripped of her K9 duty. Plaintiff's statistics can be summarized into the following categories: (1) defendant hires fewer females than males; (2) females are terminated or resign in higher proportions; and (3) defendant employs fewer female deputies in its special duty units that involve higher compensation, while male deputies may hold two or three special duty unit positions simultaneously. Plaintiff argues that this evidence supports her claim that similarly situated male employees, outside the protected class, received systematically better treatment.

Defendant concedes that there are fewer women employed as deputies than men but argues that all of plaintiff's statistical evidence is of limited value because it fails to account for alternative explanations. But defendant provides no alternative explanations. Rather, under the direct method of proof, defendant relies heavily on the fact that plaintiff received a second K9 dog. This meant she prevailed over 12 male applicants in receiving that second dog. But what defendant does not address

---

[51]*Id. (citing* Rogers v. City of Chicago, 320 F.3d 748, 753 (7th Cir.2003)).
[52]*Id.* (quoting *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 737 (7th Cir.1994)).
[53]*Montgomery v. Am. Airlines,* 626 F.3d 383, 393 (7th Cir. 2010).

is plaintiff's claim that other male deputies had always automatically been assigned new dogs, with no requirement to re-interview.[54] Nor does defendant address that plaintiff was told that she had to re-interview because the Sheriff wanted to "give the boys a chance."[55]

After plaintiff was selected to continue with the K9 unit, and had received her second dog, plaintiff claims that defendant began a campaign of pretextual and discriminatory confrontations concerning her job performance in an effort to strip her of her new K9. Plaintiff references no performance issues prior to her new dog, but beginning in July 2009, she claims defendant began including write-ups in her performance impact log. First, she was criticized for the first time for misuse of sick time in July 2009, and then again in January 2010 and April 2010, though she had doctor's notes for two of those cases.[56] Plaintiff was also disciplined for leaving a K9 training early, though she claimed male deputies did not even attend but were not disciplined.[57] Plaintiff also references not being issued a properly working squad car,[58] not being given equipment that other, male, deputies were issued, being yelled at for sending a squad car to a residence, when in fact it was dispatched by someone else,[59] being counseled and warned for failure to issue sufficient traffic citations for a particular month, though her shift had been changed,[60] and was written up for failure to attend a K9 demonstration that she ultimately attended.[61] Defendant even investigated possible criminal charges against plaintiff for theft of overtime,[62] then later for alleged theft of dog food,

---

[54]Def's Resp. L.R. 56.1, ¶¶ 17,18, dkt. 139.
[55]Def's Resp. L.R. 56.1, ¶ 19, dkt. 139.
[56]Def's Resp. L.R. 56.1, ¶¶ 60-61, dkt. 139.
[57]Def's Resp. L.R. 56.1, ¶ 68, dkt. 139.
[58]Def's Resp. L.R. 56.1, ¶ 62, dkt. 139.
[59]Pl's Resp. L.R. 56.1,¶55, dkt. 122.
[60]Pl's Resp. L.R. 56.1,¶57, dkt. 122.
[61]Def's Resp. L.R. 56.1, ¶70, dkt. 139.
[62]Def's Resp. L.R. 56.1, ¶54, dkt. 139.

which was determined "unfounded."[63]

All of these events occurred in the year proceeding her discipline, which ultimately stripped plaintiff of her K9 duty. Then, as noted, in January and April 2010, the coyote incident took place. When plaintiff was called to the school in April, she spoke with the school superintendent and offered to return the plastic coyote decoy. But it was not until June 2010, a month prior to her discipline, that the superintendent of the school - where the coyote incident occurred - submitted a complaint, plaintiff alleges, at the urging of defendant. In that complaint, the superintendent requested the coyote plaintiff took be returned to the school, and claimed that plaintiff had been unprofessional, and appeared "angry and annoyed" when she had spoken to her in April.[64]

Defendant appears to rely on this incident as the sole reason plaintiff was demoted. Defendant explains that plaintiff's conduct in taking the plastic coyote decoy to her home, and then placing it in the trash for several months, violated a Sheriff's General Order that provides,

> Under normal circumstances, any items or property found, recovered, or having evidential value will **NOT** be kept in the possession of a Department Member beyond termination of his/her current shift.[65]

Essentially, defendant removed plaintiff from the Canine Division for her failure to comply with the Sheriff's General Order, along with her "unprofessional verbal" exchange with the school's superintendent.[66]

Though stepping into the factors that relate specifically to the indirect method of proof, we note that, in response, plaintiff argues that no other similarly situated male officer was ever

---

[63] Def's Resp. L.R. 56.1, ¶65, dkt. 139.
[64] Def's L.R. 56.1, ¶67, exh. 12, dkt.116.
[65] Def's Resp. Pl's L.R. 56.1, exh. A, dkt. 139.
[66] Pl's Resp. L.R. 56.1,¶70-71, dkt. 122.

disciplined to the same extent for failure to place items lacking in evidentiary value into property control. She then reviews several examples of violations by male deputies, many where they involved multiple violations but resulted in citations or simply one day suspensions.[67] Defendant rebukes plaintiff's examples as insufficient because those deputies were not both assigned to special duty positions, and violators of this particular General Order (though one Deputy referenced was, in fact, a K9 Special Duty officer who committed battery on a civilian and was issued a 30 day suspension, but not removed from the unit[68]).

Plaintiff also refers to testimony from former Deputy Lawrence Oliver, where he explained that there were routinely items that were not put in property control but were, instead, "disposed of" because "there was no need or reason to follow up further with those items."[69] Deputy Oliver also distinguished items that were required to be put into evidence, such as those with value or those needing further investigation, or if the items were tied to an existing case.[70]

Returning to the test required under the direct method of proof, plaintiff alleges that the increased scrutiny of her behavior after receiving her second dog, coupled with the suspicious timing of the complaint from the superintendent, having been submitted months after the coyote incident and only one month prior to her being removed from her K9 duty, demonstrates that defendant never intended that she would remain on K9 duty. All of this put together must evidence, even if through bits and pieces of circumstantial evidence, that these actions were taken for a discriminatory reason.[71]

---

[67] Def's Resp. L.R. 56.1 ¶¶29-31, dkt. 139.
[68] Def's Resp. L.R. 56.1 ¶37, dkt. 139.
[69] Pl's Resp. L.R. 56.1, exh. N-1, Oliver Dep., p. 39.
[70] Pl's Resp. L.R. 56.1, exh. N-1, Oliver Dep., p. 40.
[71] *See Overly v. KeyBank Nat. Ass'n,* 662 F.3d 856, 865 (7th Cir. 2011).

We believe plaintiff has offered enough evidence of suspiciously timed acts, directed at her, in close proximity to the adverse employment action, to present a genuine issue of fact as to defendant's motive. Under the mosaic approach, a discrimination case can "'be made by assembling a number of pieces of evidence none meaningful in itself, consistent with the proposition of statistical theory that a number of observations each of which supports a proposition only weakly can, when taken as a whole, provide strong support if all point in the same direction.'"[72] We believe plaintiff's evidence falls into this category that - taken as a whole - a rational jury could conclude that defendant disciplined her on account of her being female.

We recognize that many courts also offer a thorough review of the indirect method of proof, which requires the plaintiff to establish a *prima facie* case of discrimination, showing that: (1) she is a member of a protected class; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) other, similarly situated individuals who were not in the protected class, were treated more favorably.[73] If that is satisfied, then a presumption of discrimination is triggered, and the burden shifts back to the employer to articulate "'some legitimate, nondiscriminatory reason' for its action."[74] If the employer does so, the plaintiff then has the burden to present evidence that the employer's stated reason is a "pretext," which permits an inference of unlawful discrimination.[75]

We briefly touched on a portion of this test above, when we outlined plaintiff's argument that no other similarly situated male deputy was treated with the same discipline, and that the particular

---

[72] *See Coleman v. Donahoe,* 667 F.3d 835, 862 (7th Cir. 2012)(applying the indirect method to withstand summary judgment).
[73] *Coleman v. Donahoe,* 667 F.3d 835, 845 (7th Cir. 2012).
[74] *Coleman,* 667 F.3d at 845.
[75] *Id.*

General Order for which she was demoted was, apparently, not always followed. We see no reason to venture further into this test. As has been articulated by several judges in our circuit, whether under the direct or indirect method of proof, ultimately what these tests were designed to do, one way or the other, is "present evidence showing that she is in a class protected by the statute, that she suffered the requisite adverse action (depending on her theory), and that a rational jury could conclude that the employer took that adverse action on account of her protected class, not for any non-invidious reason."[76] So rather than continuing on through a detailed review of the indirect method, and engaging in "an allemande worthy of the 16th century,"[77] we find that through the evidence we have already reviewed, plaintiff has met her burden.

IV.     **Conclusion**

For the reasons outlined, defendant's motion for summary judgment is granted in part and denied in part [dkt. 114]. The motion is granted with respect to any claim of a hostile work environment, but denied with respect to plaintiff's gender discrimination count. The case is set for further status on August 21, 2013 at 9:30 a.m. at which time the parties should be prepared to discuss a trial date.

**IT IS SO ORDERED.**

**ENTERED:** August 13, 2013

                                                      **UNITED STATES MAGISTRATE JUDGE**
                                                      **Susan E. Cox**

---

[76] *Id.* at 863 *(concurring); see also Hitchcock v. Angel Corps, Inc.,* 718 F.3d 733, 737 (7th Cir. 2013)(applying the more "straightforward analysis of discriminatory causation" noting the "'snarls and knots'" of the "ossified direct/indirect paradigm").

[77] *Coleman,* 667 F.3d at 863 *(concurring).*